IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BLUERADIOS, INC., | ) | |
| a Colorado corporation, | ) | |
| | ) | |
|     Plaintiff, | ) | Civil Action No. |
| | ) | |
| v. | ) | |
| | ) | |
| HAMILTON, BROOK, SMITH, & | ) | |
| REYNOLDS, P.C., a Massachusetts | ) | |
| professional corporation; | ) | |
| DAVID J. THIBODEAU, JR., an individual; | ) | |
| LAWRENCE P. COGSWELL III, an | ) | |
| individual; | ) | |
| GERALD KAZANJIAN, an individual; | ) | |
| DAVID E. BROOK, an individual; and | ) | |
| JOSHUA MATLOFF, an individual. | ) | |
| | ) | |
|     Defendants. | ) | |

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff BlueRadios, Inc., through its attorneys brings its Complaint and Jury Demand against Defendants Hamilton, Brook, Smith, & Reynolds. P.C (the "Law Firm"), David J. Thibodeau, Lawrence P. Cogswell III, David E. Brook, Gerald Kazanjian, and Joshua Matloff (hereafter, collectively, "Defendants"), and alleges as follows:

**<u>INTRODUCTION</u>**

1.    This is a legal malpractice case arising from a law firm betraying one

client for the benefit of another.  Plaintiff BlueRadios, Inc. ("BlueRadios") is a Colorado company with expertise in developing wireless and voice communications technology.  Kopin Corporation ("Kopin") is a Massachusetts-based company with expertise in designing and manufacturing microdisplay technology.  In 2007, BlueRadios and Kopin entered into a contract to jointly develop technology that would marry BlueRadios' expertise in wireless communications with Kopin's expertise in microdisplays. The parties' goal was to create a new technology that came to be called Golden-i. The Golden-i Project eventually included technology developed for head mounted computers, with wireless, hands-free motion and voice control capabilities that displayed data. The technology has infinite applications for industrial, defense, and consumer products.

2.      In their contract, BlueRadios and Kopin agreed that they would seek patent protection for certain intellectual property that BlueRadios had already developed, as well as for inventions created as part of the Golden-i Project.  The parties agreed that Kopin would pay for applying for the patents, including the fees of patent counsel.  Kopin chose the law firm of Hamilton, Brook, Smith & Reynolds, P.C., for the patent work.  The Law Firm had extensive contact with BlueRadios in the following months and years.  To assist the Law Firm with applying for the patents, BlueRadios conveyed substantial and highly confidential information to the Law Firm, including technical specifications and figures for technology that BlueRadios had already invented, as well as inventions created during its

2

collaboration with Kopin.

3.      BlueRadios accepted legal advice from the Law Firm about what was and what was not patentable when developing the technology.  BlueRadios believed that the Law Firm was its attorneys for purposes of the Patent Work, and the Law Firm acted as such.  However, over the years, instead of protecting the technology of their client, BlueRadios, the Law Firm betrayed BlueRadios.  Indeed, the Law Firm developed a plan to assist Kopin with misappropriating BlueRadios' technology and to scrape off BlueRadios from its ownership interest in the patents.  The Law Firm assisted Kopin in breaching Kopin's fiduciary duties to BlueRadios and, moreover, violated Law Firm's own fiduciary duties to BlueRadios.

4.      Because of Law Firm's torts, BlueRadios has suffered significant financial losses and has expended millions of dollars in attorney fees and litigation costs attempting to recover its intellectual property from Kopin.  Moreover, because Law Firm exposed BlueRadios' trade secrets in patents, BlueRadios has forever lost trade secret protection for its intellectual property, but it also doesn't have the patents and it hasn't received a penny of royalty payments from Kopin.  By this lawsuit, Plaintiff BlueRadios seeks to recover its financial losses from Defendants.

## PARTIES

5.      Plaintiff BlueRadios, Inc. ("BlueRadios") is a Colorado corporation, in good standing with the Colorado Secretary of State, Identification Number 20021077630, with its principal place of business located at 200 S. Wilcox St., Unit

158, Castle Rock, Colorado 80104.  BlueRadios' shareholders are Mark Kramer and Will Tucker, both of whom are residents of Colorado.

6.     Defendant Hamilton, Brook, Smith, & Reynolds, P.C. ("the Law Firm") is a Massachusetts professional corporation formed with Secretary of the Commonwealth of Massachusetts, Identification Number 043052260. The Law Firm's principal place of business is located at 530 Virginia Road, P.O. Box 9133, Concord, Massachusetts 01742.  The Law Firm maintains offices located at 155 Seaport Boulevard, Boston, Massachusetts 02210 (the "Boston Office") and 520 Virginia Road, Concord, Massachusetts 01742 (the "Concord Office").

7.     Defendant David E. Brook ("Brook") is a lawyer licensed to practice law in the Commonwealth of Massachusetts, Massachusetts Board of Bar Overseers Number 058740, and is currently associated with the Law Firm as a Founder and Principal.  Upon information and belief, Brook is a resident of the Commonwealth of Massachusetts residing in Acton, Massachusetts.  Brook is registered as an attorney patent practitioner with the United States Patent and Trademark Office, registration number 22,592, and has been so registered since 1969.  Brook may be served with process at the Concord Office.  Brook is the Secretary of Kopin's Board of Directors and owns shares in Kopin.

8.     Defendant David J. Thibodeau, Jr. ("Thibodeau") is a lawyer licensed to practice law in the Commonwealth of Massachusetts, Massachusetts Board of Bar Overseers Number 547554, and was formerly associated with the Law Firm as

4

a Principal.  Upon information and belief, Thibodeau is a resident of Florida,

residing in Poinciana, Florida.  Thibodeau is registered as an attorney patent

practitioner with the United States Patent and Trademark Office, registration

number 31,671, and has been so registered since 1985.  Thibodeau may be served

with process at VLP Law Group LLP, 37 Governor Wentworth Road, Amherst, New

Hampshire 03031.

9.      Defendant Lawrence P. Cogswell III ("Cogswell") is a lawyer licensed

to practice law in the Commonwealth of Massachusetts, Massachusetts Board of

Bar Overseers Number 664386, and is currently associated with the Law Firm as a

Principal.  Upon information and belief, Cogswell is a resident of the

Commonwealth of Massachusetts, and resides in Dover, Massachusetts.  Cogswell

is registered as an attorney patent practitioner with the United States Patent and

Trademark Office, registration number 71,441, and has been so registered since

2013.  Cogswell may be served with process at the Boston Office.

10.     Defendant Gerald Kazanjian ("Kazanjian") a lawyer licensed to

practice law in the Commonwealth of Massachusetts, Massachusetts Board of Bar

Overseers Number 665950, and was formerly associated with the Law Firm as an

Associate.  Upon information and belief, Kazanjian is a resident of the

Commonwealth of Massachusetts, and resides in Hopkinton, Massachusetts.

Kazanjian is registered as an attorney patent practitioner with the United States

Patent and Trademark Office, registration number 61,699, and has been so

registered since 2008.  Kazanjian may be served with process at SharkNinja

Operating LLC, 89A St. #100, Needham, Massachusetts 02494.

11.     Defendant Joshua Matloff ("Matloff") is a lawyer licensed to practice

law in the Commonwealth of Massachusetts, Massachusetts Board of Bar Overseers

Number 679613, and is currently associated with the Law Firm as an Associate.

Upon information and belief, Matloff is a resident of the Commonwealth of

Massachusetts, and resides in Watertown, Massachusetts.  Matloff is registered as

an attorney patent practitioner with the United States Patent and Trademark

Office, registration number 65,390, and has been so registered since 2012.  Matloff

may be served with process at the Concord Office.

12.     In addition to Defendant attorneys identified above, the following

attorneys were associated with, and employed by, the Law Firm at times relevant to

the allegations in this Complaint and Jury Demand: Jean Paul Cass ("Cass"),

Ronald Demsher ("Demsher"), Jana Lewis ("Lewis"), Nelson Scott Pierce ("Pierce"),

Kristen Salvaggio ("Salvaggio"), Michael A. Sinall ("Sinall"), and Mary Lou

Wakimura ("Wakimura").

13.     At all times relevant to the allegations in this Complaint and Jury

Demand, Brook, Cass, Cogswell, Demsher, Lewis, Kazanjian, Matloff, Pierce,

Thibodeau, Salvaggio, Sinall, and Wakimura were acting within the course and

scope of their employment with the Law Firm.

## JURISDICTION & VENUE

14.     This Court has personal jurisdiction over the Defendants because each Defendant is a resident of the Commonwealth Massachusetts or caused tortious injury by an act or omission in the Commonwealth of Massachusetts.

15.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.  This Court also has jurisdiction pursuant to 28 U.S.C § 1338(a) in that the Plaintiff's claims relate to legal malpractice claims arising under application of patent law.  *Max-Plank-Gesellschaft Zur Foerderung Der Wissenschaften, E.V. v. Wolf Greenfield & Sacks, P.C.,* 661 F. Supp. 2nd 125 (D. Mass. 2009).

16.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

17.     Wireless communication through Bluetooth®, Bluetooth Low Energy®, and other wireless technologies (collectively, "Bluetooth") use a radio frequency to share data over a short distance.  Although such technology was novel in the late 1990's and early-2000's, it has become the global standard for short-range wireless connectivity employed in a broad range of electronic devices.

18.     BlueRadios is a data and voice communications company that designs,

develops, and markets wireless hardware, software, and consulting services aimed at providing "plug-and-play" solutions to manufacturers in many industries looking to equip products with Bluetooth technology.

19.     BlueRadios has designed and manufactured some of the world's smallest hardware (*i.e.,* radio modems and wireless sensors) capable of sharing data between electronic devices using Bluetooth and similar technologies.

20.     BlueRadios has inventive contributions in the fields of wireless protocols, wireless data transfer, wireless and wireless modules, and other products, and holds several pending and issued patents in those fields.

21.     Mark Kramer ("Kramer") is the President and founder of BlueRadios.

22.     Wilfred "Will" Tucker ("Tucker") is, and at all relevant times acted as, BlueRadios' Chief Technology Officer.

23.     John Sample ("Sample"), at all relevant times was one of BlueRadios' embedded engineers.

24.     At all relevant times, Randy Jones ("Jones") was a founder of, and Software Architect at, BlueRadios.

25.     Kramer, Tucker, Sample, and Jones assigned to BlueRadios all of their rights in any intellectual property developed as a part of their employment with BlueRadios.

26.     Kopin is a multi-national, publicly traded Delaware corporation that manufactures and sells microdisplays primarily for sale in military, industrial and

consumer markets, and monetizes its patent portfolio.  In the 1990's Kopin's

business focused on the sale of microdisplays installed in consumer camcorders and

products used by the military.  However, as technology matured, Kopin's

microdisplay business began to decline.

28. John C.C. Fan ("Fan") is, and at all relevant times was, Kopin's

founder, Chairman, Chief Executive Officer, and President.

28. Hong Choi ("Choi") is, and at all relevant times acted as, Kopin's Chief

Technology Officer.

29. Steve Pombo served as a mechanical technician employed by Kopin

until 2014, when he left Kopin to join RealWear, Inc. ("RealWear).

30. At all relevant times, Jeffrey J. Jacobsen ("Jacobsen") was employed by

Kopin as a senior advisor to the CEO (Fan), until Kopin terminated Jacobsen's

employment in 2019.

31. The acts and omissions attributed to Fan, Choi, Pombo, and Jacobsen

during the time in which they were each employed by Kopin occurred within the

course and scope of their employment for Kopin.

### The Golden-i Contract Between BlueRadios and Kopin

32. In the fall of 2006, Jacobsen of Kopin and Kramer of BlueRadios

discussed a potential business relationship between BlueRadios and Kopin aimed at

designing, developing, and manufacturing a potential headset that would later be

called "Golden-i," capable of playing and controlling audio and video, hands-free, by

voice, and wirelessly.

33.     Jacobsen approached BlueRadios because BlueRadios possessed knowledge, expertise, and proprietary information about wireless technology, whereas Kopin did not.  Indeed, in early 2007, Jacobsen explained to Kramer that Kopin had no wireless or radio expertise.

34.     Kramer informed Jacobsen that BlueRadios had developed technology that enabled wireless streaming of high-quality video and audio using Bluetooth and miniaturization of printed circuit resulting in printed circuit boards ("PCBs") small enough to be worn on glasses.

35.     Kramer told Jacobsen, BlueRadios had no interest in becoming Kopin's subcontractor.  Rather, BlueRadios was only interested in a collaborative relationship with Kopin on the Golden-i Project.

36.     Kopin too wanted to develop a significant business relationship with BlueRadios because, as Fan expressed in e-mails forwarded to Kramer, the wireless streaming of video, comprehensively protected with patents, would position the companies to "win Big."

37.     Kopin and BlueRadios entered into a mutual Non-Disclosure Agreement ("NDA") and subsequently began a series of conversations about preparing for a demonstration of BlueRadios' technology during a meeting at Kopin's corporate headquarters in April 2007.

38.     With Kopin's encouragement and assurance that such information

would be kept confidential, and a signed NDA, BlueRadios began sharing with Kopin its trade secrets and proprietary information about wireless communication, the miniaturization of PCBs and the incorporation of wireless technology, *e.g.*, Bluetooth, into devices such as the contemplated Golden-i.

39.     BlueRadios provided Kopin with a confidential "Build of Materials" and other information that would later be incorporated into a "Bubble Figure" and "Hardware Figure" (described more particularly below).

40.     Kopin incorporated the Build of Materials, Bubble Figure, and other confidential information it received from BlueRadios into a PowerPoint slide deck dated January 11, 2007 that Kopin marked proprietary.

41.     Early on, Jacobsen discussed with Kramer about the need to draft and file provisional patent applications relating to the technology to be developed during the Golden-i Project.

42.     Prior to its collaboration with Kopin, BlueRadios had already designed and developed much of the wireless technology suitable for use in a product such as that contemplated by the Golden-i Project.  For example, before Kopin contacted BlueRadios in the fall of 2006, BlueRadios was successfully transmitting video to display devices, wirelessly, over Bluetooth and WiFi.  At that time, BlueRadios' technology was revolutionary.

43.     On March 30, 2007, Jacobsen stated in an e-mail to Kramer "everyone will be impressed with what BlueRadios has accomplished with Bluetooth 2.0."

11

44.     On April 10, 2007, Kramer and Sample of BlueRadios travelled to Kopin's headquarters in Massachusetts and met with Fan, Jacobsen, Choi, Boryeu Tsaur, Frederick Hermann, Murshed Khandaker, Dave Costa, and Steve Pombo of Kopin (the "April 10, 2007 Meeting").

45.     At the April 10, 2007 Meeting, BlueRadios demonstrated its confidential and proprietary technology to Kopin, including wirelessly streaming video from a mobile phone to a microdisplay.  BlueRadios also provided Kopin with detailed information about how a head-mounted, wireless, computer could become commercially feasible.

46.     Kopin management was impressed.  On May 18, 2007, Jacobsen wrote an e-mail to Kramer, stating that Kopin's senior management and contract counsel "have been adequately appraised, that without BlueRadios pre-existing Bluetooth knowledge, know-how and technology independently developed, Golden-i would be impossible to manufacture at this time."

47.     In his May 18, 2007 email, Jacobsen also stated that "[i]t is important that we protect the technology, file patents where appropriate and make [sure] that BlueRadios receives all royalties and benefits coming to them."

48.      In May 2007, BlueRadios sent Kopin a proposal for its joint venture with Kopin, titled "Contract Proposal for Kopin *Golden-i* Wireless Video Design Solution."

49.     Kopin signed the proposal on May 31, 2007 and BlueRadios signed the

proposal on June 5, 2007, which thereupon became the "Golden-i Contract,"

attached as **Exhibit 1.** The Golden-i Contract states:

> Any intellectual property rights developed by BlueRadios in the course of this development contract ("Joint Developments"), will be owned jointly with no obligation of financial accounting to the other party; provided, however, that BlueRadios agrees not to use, sell or license Joint Developments for any micro-display applications.
>
> Kopin will have the sole right and responsibility to decide whether or not to seek patent protection with respect to any intellectual property rights that are developed as part of or incorporated into the project deliverables and to file for, procure and maintain such patents at Kopin's expense.
>
> BlueRadios hereby grants Kopin an exclusive royalty-bearing (under Article V above) license to any solely owned BlueRadios intellectual property rights incorporated into the project deliverables to use, sublicense, make and have made, and sell products for all micro-display applications. BlueRadios reserves all rights under its solely owned intellectual property rights for all non-micro-display applications.

50.     After the parties signed the Golden-i Contract, Jacobsen of Kopin met

with Kramer, Tucker, Sample, and Jones at BlueRadios' office in Colorado. During

the meeting, the parties further discussed BlueRadios' technology and how

BlueRadios planned to incorporate aspects of that technology into the Golden-i

Project.

51.     Jacobsen assured Jones that Kopin would keep BlueRadios'

information confidential until the parties filed patent applications relating to the

information and that the patent applications relating to the technology BlueRadios

had developed would name BlueRadios' employees as inventors.

52.     After the parties signed the Golden-i Contract, BlueRadios began

adapting its previously developed technology, and developing new technology, for

use in the *Golden-i* Project.  About the same time, Kopin began paying BlueRadios

as required under the contract.

53.     As used herein, the term Golden-i Project is not limited to products specifically referred to as Golden-i.  The term includes technology and intellectual property developed for and incorporated into wearable computing devices with hands free, voice and/or gesture active command and control. The term Golden-i Project should be broadly interpreted and includes hardware, software, firmware and electronic design files, and applications in military, industrial, and commercial fields.

**The Law Firm Begins Representing BlueRadios and Kopin.**

54.     When BlueRadios and Kopin began collaborating, Kopin repeatedly expressed its desire to patent the technology.

55.     BlueRadios had not previously patented the technology and other intellectual property it developed, preferring instead to protect its inventions as trade secrets which are, by definition, secret.  However, Kopin repeatedly stressed the importance of obtaining patent protection.

56.     Because BlueRadios relied on trade secret protection for its intellectual property, it did not have a relationship with a patent law firm when it began collaborating with Kopin.

57.     Kopin, on the other hand, had a longstanding and close relationship with the Law Firm. For example, during Kopin's 2004 fiscal year, it paid the Law Firm attorney fees of approximately $525,682, during Kopin's 2005 fiscal year, it paid the Law Firm attorney fees of about $513,000, and, during Kopin's 2006 fiscal

14

year, it paid the Law Firm attorney fees of approximately $422,000.

58.   Brook, a Founder and Principal of the Law Firm, has served as a Director on Kopin's Board of Directors since 1984, and has also served as the Secretary of Kopin's Board of Directors.  According to Kopin's filings with the Securities and Exchange Commission, among other things, Brook "counsels [Kopin] on developing IP strategies to protect [Kopin's] investments."

59.   Brook currently receives, and has historically received, annual compensation from Kopin as a result of his work as a Director.

60.   Brook was also a Kopin shareholder.  According to U.S. Securities & Exchange Commission filings, Brook recently owned more than 300,000 shares of Kopin.  However, just days before the parties' tolling agreement expired and BlueRadios filed this action, according to SEC filings, Brook sold all but 10,000 of his shares for more than $2.8 million.

61.   BlueRadios did not know in 2007 that Brook served on Kopin's Board of Directors or that Brook was a shareholder of Kopin.

62.   Kopin insisted that BlueRadios and Kopin use the Law Firm for the purpose of the patent work on the technology the parties had developed, and would develop, for use during the Golden-i Project.

63.   BlueRadios agreed to use the Law Firm for purposes of preparing, filing for, prosecuting, procuring, and maintaining patents ("the Patent Work").  Indeed, it appeared to BlueRadios that the Law Firm had precisely the expertise

15

and experience necessary to protect BlueRadios' intellectual property.

64.    As part of the Golden-i Contract, BlueRadios and Kopin agreed that Kopin would pay the Law Firm's attorney fees and costs associated with the Patent Work.

65.    In mid-2007, the Law Firm began representing and assisting both BlueRadios and Kopin with evaluating the inventive contributions of BlueRadios employees and Kopin employees to determine whether those inventions were patentable, and for the Patent Work related to those inventions.

66.    The Law Firm and its attorneys knew that, pursuant to the Golden-i Contract, they would be applying for patents for intellectual property that BlueRadios developed in collaboration with Kopin.

67.    The Law Firm knew that BlueRadios would have certain ownership rights in the intellectual property developed in collaboration with Kopin.

68.    The Law Firm and its attorneys also knew that, under the terms of the Golden-i Contract, they would be applying for patents for intellectual property that BlueRadios had developed *before* it started collaborating with Kopin.

69.    The Law Firm knew that BlueRadios was to be the sole owner of the patents for the technology that BlueRadios had invented before collaborating with Kopin.

70.    The Law Firm knew that BlueRadios employed Kramer, Tucker, Sample, and Jones, that each of those individuals had assigned their inventive

16

rights to BlueRadios, and that none of them had ever assigned their inventive rights to Kopin.

71.    The Law Firm knew that, under the Golden-i Contract, Kopin would pay their attorneys' fees and costs charged for the Patent Work for both the intellectual property that BlueRadios developed in collaboration with Kopin and certain intellectual property that BlueRadios developed before collaborating with Kopin.

72.    In mid-June 2007, Jacobsen introduced Kramer and Tucker of BlueRadios to Defendant Thibodeau and Cass, both then employed by the Law Firm, and asked Kramer and Tucker to start working with Thibodeau and Cass to prepare patent disclosures that covered BlueRadios' pre-existing wireless technology.

73.    Kramer, Tucker, and Thibodeau participated in introductory calls.  At no time did Thibodeau, or anyone else at the Law Firm, communicate that the Law Firm did not represent BlueRadios or ask if any other attorney or law firm represented BlueRadios.  Rather, Thibodeau's statements led Kramer and Tucker to believe that Thibodeau was well aware of the arrangement between BlueRadios and Kopin and that the Law Firm would be working to further both BlueRadios' and Kopin's interests by the Patent Work.

74.    After the introductory calls, Tucker spoke with Thibodeau at length regarding BlueRadios' business, technology and intellectual property.  During the

17

call, Thibodeau explained that the Law Firm was preparing to draft the patent applications designed to protect certain BlueRadios' technology and needed information about the technology to further the process.

75.   Believing that the Law Firm represented BlueRadios, Tucker provided Thibodeau a detailed description of the technology and systems BlueRadios had developed, and was in the process of developing, including a description of how the technology and systems worked, what was unique about them, and how BlueRadios' work was progressing.

76.   As BlueRadios' Chief Technology Officer, Tucker was well aware that much of the information he provided to Thibodeau was confidential and were trade secrets and he expected the Law Firm to keep the information confidential and to use it only to further the interests of BlueRadios and the Golden-i Project.

77.   Tucker would not have provided the information he provided to Thibodeau, or anyone else affiliated with the Law Firm, had he believed that the Law Firm did not represent BlueRadios.

78.   Throughout the summer of 2007, BlueRadios employees continued to speak to the Law Firm about the wireless technology and other trade secrets BlueRadios had developed, and was in the process of developing, in order to give the Law Firm additional information it requested to prepare patent applications.  When the Law Firm needed additional information, the attorneys would call BlueRadios directly, and oftentimes Kramer fielded the call himself.

79.     On August 16, 2007, Jacobsen requested that Tucker send the Law Firm "a 'Master List' of BlueRadios [sic] unique technologies, technical solutions, processes, etc… that . . . may be patentable" so that the Law Firm could work to determine each listed item's priority and/or patentability and "[t]hen BlueRadios and [the Law Firm] can create a list of explanations, drawings, and specifications that BlueRadios should provide to support each patent claim" in an all-inclusive Bluetooth and wireless technology patent application.

80.     Kramer, Tucker, Sample, and Jones met in BlueRadios' conference room and compiled a list of BlueRadios' technology, systems, and other information to provide to the Law Firm.

81.     The same day, August 16, 2007, Thibodeau followed up with Tucker, and requested a call to discuss the information described in Jacobsen's e-mail.

82.     On August 22, 2007, Tucker e-mailed Thibodeau the list of hardware, software, and systems that BlueRadios had developed or planned to develop, seeking the Law Firm's analysis and legal advice as to whether the inventions could be patented.

83.     Tucker's August 22, 2007 e-mail also included a detailed schematic hardware diagram of BlueRadios' baseline system design for wireless transmission of video.

84.     Versions of BlueRadios' hardware diagram, such as the one depicted below, appeared as figures in numerous patent applications and patents the Law

Firm filed:



FIG. 3

(This Figure and versions of it, collectively the "Hardware Figure").

85.     The Hardware Figure contains intellectual property that was developed by BlueRadios.

86.     In response to Tucker's August 22, 2007 e-mail, Thibodeau thanked Tucker for the information, asked Tucker to give the "patent attorneys a little time to review" the information, and proposed a time to discuss the information.

87.     Thereafter, BlueRadios, through Kramer, Tucker, and others, consulted with the Law Firm's attorneys on numerous occasions about BlueRadios' information, the Law Firm's assessment of BlueRadios' ability to obtain patent protection of that information, and the details of preparing and filing patent applications.

20

88.     BlueRadios sought legal advice from the Law Firm and its attorneys.

89.     The matters for which BlueRadios sought legal advice was specifically within the area of the Law Firm's and its attorneys' professional competence, *i.e.* patent law.

90.     The Law Firm's attorneys provided legal advice to BlueRadios about the patentability of the technology that BlueRadios described and provided to the Law Firm and the Law Firm began preparing patent applications for BlueRadios' technology.

91.     BlueRadios provided information to the Law Firm and its attorneys, in confidence, and for the purpose of obtaining the Law Firm's legal advice about the evaluation of BlueRadios' inventions and to further the Law Firm's representation of BlueRadios in preparing and applying for patents.

92.     BlueRadios made decisions about and changes to its technology and designs in reliance on and in response to the Law Firm's legal advice about what was patentable and what was not patentable.

93.     At no time during the many conversations between the Law Firm's attorneys and BlueRadios did any of the attorneys tell BlueRadios, or any of its employees, whether in person, by telephone, by e-mail, letter or writing, that the they did not represent BlueRadios or that the they were not protecting BlueRadios' interests or were not seeking patent protection for BlueRadios' inventive contributions.

94.     At no time did the Law Firm's attorneys tell BlueRadios, or any of its employees, that they might have a conflict of interest in representing both their long-standing client, Kopin, and their other client, BlueRadios.

95.     At no time did the Law Firm's attorneys provide BlueRadios, or any of its employees, with a written disclaimer, or written waiver of conflicts of interest, that put BlueRadios on notice that they were not acting as its attorneys.

96.     At no time did the Law Firm's attorneys advise BlueRadios, or any of its employees, either orally or in writing, that BlueRadios should seek independent counsel.

97.     At no time did the Law Firm's attorneys ask BlueRadios, or any of its employees, orally or in writing, who else represented BlueRadios.

98.      The Law Firm and its attorneys knew, or should have known, that BlueRadios believed the Law Firm to be its attorneys.

99.     The Law Firm expressly or impliedly agreed to represent both BlueRadios and Kopin for the Patent Work.

100.    BlueRadios' reasonably relied upon the legal advice provided by the Law Firm and its attorneys.

101.    The Law Firm knew, or should have known, that BlueRadios was relying upon its legal advice, but did nothing to negate it.

## Principles of Patent Prosecution

102.    An invention is a product or process that provides a new way of doing

22

something, or offers a new technical solution to a problem.

103.   A patent is an exclusive right, granted by a government, to exclude others from making, using, offering for sale, selling, or importing an invention for a specified period of time, usually 20 years from the filing date of the first patent application.

### *Patent Applications*

104.   In the United States, to obtain a patent over an invention, an inventor or the inventor's agent must file a patent application with the United States Patent and Trademark Office ("USPTO").

105.   In the United States, there are several basic types of patent applications, including: provisional applications, non-provisional applications, and continuation applications.

106.   Provisional applications require a written description of the invention and may include figures as necessary or appropriate.

107.   The USPTO does not examine provisional applications and provisional applications do not mature, or issue, into patents.  Only non-provisional applications may become patents.  However, provisional applications can be used to secure a filing date before incurring the costs associated with filing and prosecuting a non-provisional application, which must be filed within one year of the filing date of the associated provisional application in order to claim the priority date thereof.

108.   A non-provisional application must include a specification, including a

description and a claim or multiple claims, drawings if necessary, an oath or declaration, and certain fees. An inventor/applicant must include drawings or figures when the invention is capable of illustration and they are necessary to understand the subject matter. Anything shown in a drawing or figure is part of the patent disclosure and can be used to support the patent claims.

109.   Once a non-provisional application is filed, a USPTO patent examiner will examine it to ensure that it complies with the required formalities and evaluate whether the claims are patentable. Part of that process involves the patent examiner's investigation of prior art – the body of pre-existing knowledge relating to the invention.

110.   A continuation application is the way to take a single patent application and turn it into two or more patents. A continuation application enables the applicant to seek broader or otherwise different claims based on the original disclosure in a non-provisional application (also known as the parent application), and the continuation application obtains the priority date of the parent application and/or the filing date of a related provisional patent application.

### *Patents*

111.   Once issued, a patent has two main components: the specification and the claims.

112.   The specification is a written disclosure of the invention and generally contains an abstract, sections on the background of the invention, a summary of the

invention, embodiments of the invention and claims, and a detailed description of the invention.

113.    A specification also usually includes figures (*e.g.*, schematics or drawings) to aid with describing the invention.

114.    Patent claims are the words that describe boundaries of the granted patent right.

115.    Each patent must have at least one claim that specifically describes and distinctly delineates the scope of the exclusive right claimed by the patent and granted by the government.

### Inventors and Assignees

116.    An inventor is a person who has contributed to the conception of the subject matter described in at least one claim in the patent application.

117.    An "assignee" means "the single assignee of the entire right, title and interest in the application or patent if there is such a single assignee, or all of the partial assignees, or all of the partial assignee and inventors who have not assigned their interest in the application or patent, who together own the entire right, title and interest in the application or patent." 37 CFR 3.71(b)(2).

118.    Only the inventor or the assignee(s) may prosecute a patent.

119.     If two or more people create an invention jointly, they may apply for a patent as joint inventors.

120.    A person who makes only a financial contribution to an invention is

not a joint inventor and cannot be joined in the patent application as an inventor.

121.  Each inventor must sign an oath or declaration that includes statements that he or she believes himself or herself to be the original inventor or an original joint inventor of the claimed invention and that he or she authorizes the patent application.

122.  The patent laws require that the application name the actual inventors, or joint inventors, of the claimed subject matter.

123.  If a patent application fails to name the true inventor or inventors of the claimed invention, a patent can be found invalid or unenforceable and, thus, the patent may be of little or no value.

124.  It is a basic principle of the practice of patent law that the patent attorneys filing a patent application <u>must</u> correctly name the true inventor or inventors for all claims presented in the application.  There are no exceptions to this basic principle.

125.  When there are joint inventors of a single invention, in the absence of an agreement to the contrary, each inventor is a joint owner in the patent or patent application, having an undivided equal partial interest in the patent.

126.  Absent written assignments of ownership in a patent, joint inventors of a patent are presumptively co-owners.

127.  Similarly, when companies together pursue research and development without agreement on ownership, each company is presumptively a co-owner of the

inventions claimed in a patent if: (i) at least one employee from the company is a co-inventor, and (ii) the employee previously assigned in writing to the company his future rights to the inventions.

128.   Thus, it is important for patent attorneys prosecuting a patent to correctly name the true inventor or inventors in the application because inventorship may affect ownership of the patent.

129.   Moreover, it is important for patent attorneys prosecuting a patent to determine if the inventors have assigned their ownership rights in a patent to another party, *i.e.*, an assignee.

130.   37 CFR 3.71(b) *Prosecution by assignee* provides:

(b) Patents-assignee(s) who can prosecute. The assignee(s) who may conduct either the prosecution of a national application for patent as the applicant under § 1.46 of this title or a supplemental examination or reexamination proceeding are:

(1) A single assignee. An assignee of the entire right, title and interest in the application or patent, or

(2) Partial assignee(s) together or with inventor(s). All partial assignees, or all partial assignees and inventors who have not assigned their right, title and interest in the application or patent, who together own the entire right, title and interest in the application or patent. . . .

131.   Patent attorneys must accurately identify assignees in a patent application or patent.

132.   It is important to properly identify all inventors and assignees when prosecuting a patent so that the USPTO knows to whom to issue the patent.

133.   To fail to name all of the actual inventors in the patent application or

patent is below the standard of care required of patent attorneys.

134.    To fail to identify of the assignees of the inventors' ownership rights in the patent application or patent is below the standard of care required of patent attorneys.

### Patent Attorneys and Patent Agents

135.    To practice before the USPTO, patent attorneys must register with the USPTO.

136.    To remain registered with the USPTO, a patent attorney must comply with USPTO regulations.

137.    Under 37 C.F.R. § 1.34 ("Acting in a representative capacity"), a patent attorney acting in a representative capacity must represent to the USPTO that "he or she is authorized to represent the particular party on whose behalf he or she acts."

138.    When an inventor employs a patent attorney, the inventor signs a Power of Attorney that is filed with the USPTO and, once the Power of Attorney is filed, the USPTO no longer communicates with the inventor directly, but with the patent attorney acting on the inventor's behalf.

139.    During the patent examination process, it is common to amend the application to avoid prior art, and such amendments often result from iterative, back-and-forth, communications between the examiner and the inventor/applicant's patent attorney.

140.    The communications between an examiner and inventor/applicant's patent attorney result in a written file history that can affect a patent later.  For example, a statement made by an inventor/applicant, through his or her patent attorney, may become a binding limitation on the scope of the patent's claims.

141.    Only one patent law firm is permitted to represent the interests of all of the owners of the inventions disclosed in a patent application.

142.    The USPTO permits only a single law firm to represent all of the owners' interests because the USPTO will only correspond with one law firm at any given time regarding a patent application.

**The Law Firm Represents BlueRadios Before the USPTO and WIPO, But Consistently Acts Contrary to BlueRadios' Interests.**

143.    The Law Firm represented BlueRadios' interests before the USPTO and international patent offices, including the World Intellectual Property Organization ("WIPO").

144.    BlueRadios, through Kramer, Tucker, Jones, and others, requested, and the Law Firm provided, advice to BlueRadios regarding the content and scope of patent applications relating to hardware, software, and systems invented by BlueRadios' employees.

145.    BlueRadios understood and believed that the Law Firm and its attorneys were acting as BlueRadios' attorneys and authorized the attorneys to prepare, file, and prosecute several patent applications on behalf of BlueRadios and its employee inventors.

29

146.    BlueRadios' employees executed Powers of Attorney authorizing the Law Firm's attorneys to act in the interests of BlueRadios before the USPTO.

147.    The Law Firm and its attorneys represented to the USPTO that they represented and possessed authority to act on behalf of BlueRadios' employees.

148.    Nevertheless, over the years, the Law Firm created a secret plan that they recommended to Kopin to attempt to deny BlueRadios its ownership rights in the patent applications the Law Firm filed and the resulting patents and deliver such rights to Kopin.

### *The Law Firm files the '177 Provisional Application and names the correct inventors.*

149.    On December 4, 2007, Jacobsen sent an e-mail to Thibodeau and Cass of the Law Firm, copying Tucker, asking Thibodeau and Cass how they were coming on the "patent disclosures for Blue Radios [sic] . . . ."

150.    In response to Jacobsen's December 4, 2007 e-mail, Thibodeau e-mailed Jacobsen of Kopin and Tucker of BlueRadios "a first draft of the BlueRadios 'hardware' patent application."

151.    On January 3, 2008, Thibodeau e-mailed Tucker of BlueRadios and Jacobsen of Kopin, asking whether Tucker should be named as the sole inventor. Tucker responded by suggesting to Thibodeau that the Law Firm name additional BlueRadios inventors.

152.    On January 4, 2008, Thibodeau e-mailed Tucker, asking a technical question relating directly to the claims set out in the draft BlueRadios hardware

patent application.

153.   On or around January 4, 2008, Thibodeau finalized the draft BlueRadios hardware patent application and prepared it for filing based on the information BlueRadios provided to the Law Firm.

154.   On January 4, 2008, Thibodeau filed U.S. Provisional Patent Application No. 61/010,177, titled "Protocol for Transporting Video Signal Over Bluetooth Wireless Interface" (the "'177 Provisional Application").

155.   The '177 Provisional Application names Thibodeau as the applicants' Power of Attorney and asked the USPTO to direct all correspondence regarding the '177 Provisional Application to the Law Firm.

156.   The '177 Provisional Application includes a figure reflecting BlueRadios' high-level conception of the use of wireless communication, *i.e.* Bluetooth, in the context of a product such as a Golden-i device:



(The "Bubble Figure").

157.   The Bubble Figure depicts intellectual property conceived and developed by BlueRadios.

158.   The '177 Provisional Application also includes BlueRadios' Hardware Figure.

159.   The '177 Provisional Application names only BlueRadios employees, Tucker, Sample, Kramer, and Jones, as applicants and inventors, although it originally included an incorrect first name for Tucker.  Tucker's first name on the application was corrected on March 12, 2009, when Kazanjian filed a replacement cover sheet for the '177 Provisional Application.

160.   With the correction of Tucker's name, the '177 Provisional Application named the correct inventors.

### *The Law Firm names Parkinson as the sole inventor of BlueRadios inventions on the '090 Provisional Application.*

161.   In about July 2007, after BlueRadios had conceived its initial conceptual designs for the technology to be used in the Golden-i Project, Christopher Parkinson ("Parkinson") began working as a consultant for Kopin through his company, Integral RFID, to write graphical user interfaces ("GUI").  Parkinson met with BlueRadios personnel on several occasions so that BlueRadios could lay out its initial designs and Parkinson could determine the scope of work and bid on writing the GUI.

162.   During those meetings, BlueRadios shared with Parkinson much of the technology it had developed prior to BlueRadios' collaboration with Kopin, as well as the technology BlueRadios was developing as part of the Golden-i Project.

163.    In the fall of 2007, within days of meeting with BlueRadios' employees in Colorado, Parkinson travelled to Massachusetts and met with Kopin and the Law Firm.

164.   On January 4, 2008, the same day he filed the '177 Provisional Application, Thibodeau filed U.S. Provisional Patent Application No. 61/010,090, titled "Mobile Wireless Display Software Platform for Controlling Other Systems and Devices" (the "'090 Provisional Application").

165.   The day before Thibodeau filed the '090 Provisional Application, a draft of the '090 Application identified Tucker and Sample of BlueRadios as inventors.

166.   However, as Thibodeau filed the final '090 Provisional Application, the application names only Parkinson as the inventor and applicant.

167.   The '090 Provisional Application includes as Figure 2 BlueRadios' Hardware Figure.

168.   The description for the Hardware Figure contained in the '090 Provisional Application incorporates by reference the '177 Provisional Application, which names only BlueRadios employees as inventors.

169.   Neither Parkinson nor any Kopin employee contributed to the

conceptions of the inventions reflected by the Hardware Figure.

170.   Claim 3 in the '090 Provisional Application states: "The device of claim 1 wherein the wireless interface is a Bluetooth physical layer with a Bluetooth proxy to implements a switching gateway."

171.   BlueRadios employees, not Parkinson or any Kopin employee, conceived the entirety of the subject matter of Claim 3 of the '090 Provisional Application.

172.   The Law Firm and Thibodeau knew that Parkinson did not contribute to the conception of the subject matter described in the Hardware Figure, the '177 Provisional Application, or Claim 3 in the '090 Provisional Application.

173.   The Law Firm and Thibodeau knew it should have named, but nevertheless failed to name, BlueRadios' employees as inventors in the '090 Provisional Application.

174.   Upon information and belief, Kopin asked the Law Firm and Thibodeau, and they agreed, to file the '090 Provisional Application with only Parkinson listed as an inventor, despite their knowledge that the '090 Provisional Application should have identified BlueRadios' employees as inventors.

175.   Upon information and belief, the Law Firm and Thibodeau named only Parkinson as the inventor in, and omitted BlueRadios employees from, the '090 Provisional Application to assist Kopin in attempting to obtain sole ownership of the technology disclosed in the '090 Provisional Application and any related patent

applications, to the detriment of BlueRadios.

176.    To further assist Kopin, the Law Firm and Thibodeau later filed documents with the USPTO assigning Parkinson's rights in the '090 Provisional Application to Kopin.

### The Law Firm files the '232 Provisional Application With BlueRadios inventions, but doesn't name BlueRadios inventors.

177.    On April 5, 2007, Cass of the Law Firm sent Jacobsen an e-mail, copying Thibodeau and Pierce, with a draft provisional application titled "a method of controlling a monocular display device and wirelessly displaying multi-media from a host computing device," asking Jacobsen to confirm the inventors the Law Firm had named in the provisional application.

178.    On May 14, 2007 (approximately one month after the April 10, 2007 Meeting and two weeks before BlueRadios and Kopin signed the Golden-i Contract), Cass filed United States Provisional Application Number 60/930,232, titled "Method for Controlling a Monocular Display Device and Wirelessly Displaying Multi-Media from A Host Computing Device" (the "'232 Provisional Application").

179.    The '232 Provisional Application contains some of the BlueRadios' proprietary information that it shared with Kopin during the early stages of their collaboration.  For example, the application describes a method of wirelessly streaming video to a head-mounted display.  At least some of the information shared by BlueRadios with Kopin was encompassed by the NDA between Kopin and BlueRadios.

35

180.    The claims in the '232 Provisional Application include, *inter alia*, "a wireless interface connected to [a] monocular display and configured to wirelessly communicate with a host computing device."

181.    The '232 Provisional Application also contains BlueRadios' Bubble Figure as Figure 3, and Figure 4 depicts information BlueRadios transmitted to Kopin in early 2007.

182.    Accordingly, the '232 Provisional Application should have named BlueRadios' employees as inventors.

183.    However, the '232 Provisional Application names as inventors only Jacobsen and Pombo of Kopin.

184.    Neither the Law Firm's attorneys nor Kopin informed BlueRadios that they intended to file, or had filed, the '232 Provisional Application naming only Jacobsen and Pombo as inventors.

185.    The Law Firm's attorneys knew due to, *inter alia*, their preparation and filing of the '177 Provisional Application, that BlueRadios employees should have been named as inventors in the '232 Provisional Application.

186.    Despite its knowledge, the Law Firm never took any steps to correct the inventorship described in the '232 Provisional Application, or the non-provisional applications claiming priority to the '232 Provisional Application.

187.    Upon information and belief, the Law Firm named only Kopin inventors in the '232 Provisional Application and did nothing to correct inventorship

36

that it knew was incorrect in order to assist Kopin in its attempts to obtain sole

ownership of the '232 Provisional Application, the technology disclosed therein, and

any patent applications or patents claiming priority to it, to the detriment of

BlueRadios.

### *BlueRadios hires Parkinson and obtains an assignment of his IP rights.*

188.    On July 28, 2008, at Kopin's urging, BlueRadios hired Parkinson as an

employee to work on the Golden-i Project.

189.    On July 28, 2008, as part of his onboarding as an employee, Parkinson

signed two agreements with BlueRadios: (i) an Employment Agreement and (ii) a

Proprietary Information and Inventions Agreement ("PIIA").

190.    Pursuant to the PIIA, Parkinson assigned to BlueRadios all of his

rights in any BlueRadios proprietary information he had or would acquire at the

time he signed the Parkinson Employment Contracts, as well as all of his rights in

any proprietary information he created while employed by BlueRadios.

191.    The PIIA also required Parkinson to list all inventions that he

conceived, developed, or reduced into practice *prior* to his employment with

BlueRadios that he desired to identify as <u>not</u> subject to the PIIA.

192.    In the PIIA, Parkinson represented he had "No Inventions."

193.    Because Parkinson did not claim any prior inventions in the PIIA, and

because he was improperly named as the only inventor on the '090 Provisional

Application when BlueRadios employees were at least actual inventors, the '090

Provisional Application became part of BlueRadios' proprietary intellectual property.

194.    The Law Firm knew or should have known that Parkinson had signed the PIIA.

195.    Despite that knowledge, the Law Firm never took any steps to correct the inventorship described in the '090 Provisional Application, or the non-provisional applications or patents claiming priority it.

196.    BlueRadios employed Parkinson until June 24, 2009.

**BlueRadios and Kopin sign an Addendum to the Golden-i Contract.**

197.    In October 2008, BlueRadios and Kopin ratified and renewed their Golden-i Contract by entering into an Addendum, attached as **Exhibit 2**, which modified only Section V of the Contract.

198.    The Addendum states that, except as modified by the Addendum, the Golden-i Contract continued in full force and effect.

199.    After signing the Addendum, BlueRadios continued to work to advance its joint venture with Kopin.

**The Law Firm does not name a BlueRadios' employee as an inventor on the '090 Provisional Application despite knowing that BlueRadios believed that it would do so.**

200.    On December 17, 2008, Kazanjian of the Law Firm sent an e-mail to Choi, Jacobsen, and Parkinson regarding the conversion of the '177 Provisional Application and the '090 Provisional Application to non-provisional applications.

201.   Kazanjian's December 17, 2008, e-mail also refers to the '462 Application and mentions that it names Tucker and Sample as inventors, but that such inventorship was "to be corrected." (The '462 Application, discussed below, claimed priority to the '177 application.)

202.   On December 24, 2008, Jacobsen forwarded Kazanjian's e-mail to Tucker (including the "to be corrected" language).  Thinking Kazanjian was referring to adding inventors to the various applications as needed (and not removing BlueRadios inventors), Tucker responded, "I also agree that anyone that contributed should be on them."

203.   In late December, 2008, Tucker and Parkinson exchanged e-mails about the inventorship on the non-provisional application that was to seek priority to the '090 Provisional Application.  Tucker stated that he believed that the non-provisional application should name Sample of BlueRadios as an inventor. Parkinson responded:

> "I personally don't mind. But when I was in Taunton last week talking to the lawyers I asked the question 'why was an original patents split into 2'. The answer is Kopin wants Kopin (and me) on their patents, and wants only BlueRadios folk on your patents. So you might get push back from someone, or maybe I just misunderstood the whole issue?"

Tucker responded:

> "I had a talk with Jeff [Jacobsen] the other day and he said that he didn't have an issue putting anyone on a patent who has contributed. So, I will keep you informed. I'm thinking that he will reply to the message I just sent."

39

204.   On January 2, 2009, Jacobsen e-mailed Choi of Kopin and Kazanjian of the Law Firm, blind copying Tucker, stating that Sample should be added as an inventor on the non-provisional application that was to seek priority to the '090 Provisional Application.

205.   BlueRadios believed that the Law Firm would name at least Mr. Sample of BlueRadios as an inventor in the application that was to seek priority to the '090 Provisional Application.

206.   In fact, Kazanjian and the Law Firm never added Sample on the non-provisional application that was to seek priority to the '090 Provisional Application.

207.   Despite knowing that at least Sample should be added as an inventor to the non-provisional application that was to seek priority to the '090 Provisional Application, upon information and belief, Choi or another person in Kopin management asked Kazanjian and the Law Firm, and Kazanjian and the Law Firm agreed, not to add Sample as an inventor to the '090 Provisional Application.

208.   The Law Firm's attorneys never told BlueRadios that they had agreed with Kopin not to add Sample as an inventor on the non-provisional application that was to seek priority to the '090 Provisional Application.

### *The Law Firm removes a BlueRadios inventor on the '627 Application and replaces him with a Kopin inventor.*

209.   The Law Firm drafted U.S. Patent Application No. 12/348,627, titled "Method and Apparatus for Transporting Video Signal Over Bluetooth Wireless

Interface" (the "'627 Application") with assistance from Tucker.

210.   Tucker made revisions to the drafts of the '627 Application and sent such changes to the Law Firm.

211.   On December 30, 2008, Thibodeau told Tucker that "BlueRadios is presently listed as the sole inventor [on the '627 Application]."

212.   Thibodeau filed the '627 Application on January 5, 2009, the deadline to claim the benefit of the '177 Provisional Application.

213.    Thibodeau and the Law Firm filed a Power of Attorney in connection with the '627 Application which states that the Law Firm was the "Authorized representative of the Assignee, Kopin Corporation, together with Mark Kramer, John M. Sample, and Wilfred I. Tucker, of the entire interest" and asked the USPTO to direct all communications regarding the '627 Application to the Law Firm.

214.   As reflected in the Power of Attorney, Thibodeau and the Law Firm were acting on behalf of, and representing, each of the inventors and applicants listed in the '627 Application, including BlueRadios' employees Kramer, Sample and Tucker.

215.   The '627 Application claims the priority to the '177 Provisional Application, which named only BlueRadios inventors.  However, in the '627 Application, Thibodeau and the Law Firm named Jacobsen of Kopin as an inventor in the place of Jones of BlueRadios.

41

216.   Jacobsen did not contribute to the conception of the subject matter described in any of the claims in, and should not have been named as an inventor on, the '627 Application.  Likewise, Jones properly should have been named as an inventor on the '627 Application.

217.   Thibodeau and the Law Firm knew that Jacobsen should not have been named as an inventor in the '627 Application.  Indeed, notes from the Law Firm's file state that Jacobsen "added himself" as an inventor on the '627 Application and state further that Jacobsen "may not be [an] inventor."

218.   Nevertheless, unbeknownst to BlueRadios, Thibodeau and the Law Firm filed the '627 Application on January 5, 2009 naming Jacobsen as an inventor and without naming Jones as an inventor.

219.   Upon information and belief, Kopin, Thibodeau, and the Law Firm agreed to name Jacobsen as a named inventor in the '627 Application despite knowing that Jacobsen did not qualify as an inventor of the subject matter disclosed in the '627 Application.

220.   Upon information and belief, Thibodeau and the Law Firm named Jacobsen as an inventor in the '627 Application to assist Kopin in attempting to obtain ownership rights in the '627 Application and any resulting patents, to the detriment of BlueRadios.

221.   Kopin, Thibodeau, and the Law Firm concealed from, and failed to disclose to, BlueRadios the fact that they filed the '627 Application i) naming

Jacobsen as an inventor and ii) omitting naming Jones as an inventor, even though they knew that Jacobsen may not qualify as an inventor.

222.   By naming Jacobsen of Kopin in the place of Jones of BlueRadios as an inventor in the '627 Application, Thibodeau and the Law Firm incorrectly named the inventors in the '627 Application.

223.   The '627 Application issued on January 15, 2013 as U.S. Patent 8,355,671 (the "'671 Patent"), which as the date of this filing has been cited in other issued patents at least forty-nine (49) times.

### *The Law Firm files the '462 Application naming both BlueRadios and Kopin inventors but identifies Kopin as the sole assignee.*

224.   The Law Firm prepared and, on May 14, 2008, Kazanjian filed U.S. Patent Application No. 12/152,462, titled "Mobile Wireless Display For Accessing Data and Method For Controlling" (the "'462 Application").

225.   As originally filed, the '462 Application claimed priority to the '177 Provisional Application.

226.   As originally filed, the '462 Application contained several inventions conceived by BlueRadios employees, including the Hardware Figure (the description of which incorporates by reference the '177 Provisional Application, naming only BlueRadios employees as inventors), a version of the Bubble Figure, and the following claim as Claim 4:

> The device of Claim 1 wherein the wireless communications interface is a BlueTooth physical layer with a Bluetooth proxy to implement a packet switching

gateway.

227.   As originally filed, the '462 Application named Tucker, Sample, and Parkinson of BlueRadios and Jacobsen and Pombo of Kopin as inventors in the specification.

228.   However, Kazanjian and the Law Firm incorrectly named Kopin as the sole assignee of the '462 Application, despite knowledge that BlueRadios' employees had assigned their inventive rights to BlueRadios and its knowledge of the terms of the Golden-i Contract.

229.   Kazanjian and the Law Firm knew that they should have named BlueRadios as an assignee, but did not, in an effort to assist Kopin in attempting to obtain ownership of the '462 Application, the subject matter disclosed therein, and any resulting patents.

### The Law Firm files the '646 Application naming both BlueRadios and Kopin inventors but identifies Kopin as the sole assignee.

230.   The Law Firm drafted U.S. Patent Application No. 12/348,646, titled "Mobile Wireless Display Software Platform for Controlling Other Systems and Devices" (the "'646 Application").

231.   Before its filing, Tucker of BlueRadios directed the Law Firm to broaden the claims in the '646 Application to include WiFi and not limit wireless communications to Bluetooth.

232.   On January 4, 2009, Kazanjian e-mailed Tucker, asking "Are you suggesting that we broaden the scope of the claims to include both Bluetooth and

WiFi as possible wireless links, or has this already been done?"  Tucker responded:

"YES" and "Make sure we have claims covering this.  Hope this Helps."

233.    One day later, on January 5, 2009, Thibodeau filed the '646

Application.

234.    Claim 6 of the originally filed '646 Application reflects the Law Firm's

effort to broaden the claims to include both Bluetooth and WiFi as possible wireless

links, as conceived by Tucker and as he directed the Law Firm to do.

235.    In addition to Claim 6, the '646 Application as originally filed included

several other inventions conceived by BlueRadios employees, including subject

matter depicted by the Hardware Figure, subject matter depicted by a modified

version of the Bubble Figure, and the following Claim 4:

> The device of Claim 1 wherein the wireless communications interface is a BlueTooth physical layer with a Bluetooth proxy to implement a packet switching gateway.

236.    As originally filed, the '646 Application was a continuation in part of

the '462 Application (which originally named BlueRadios employees as inventors)

and claimed priority to the '177 Provisional Application (which only named

BlueRadios employees as inventors).

237.    As originally filed, the '646 Application names as inventors Tucker,

Sample, and Parkinson of BlueRadios and Jacobsen of Kopin.

238.    However, and despite knowledge that BlueRadios' employees had

assigned their inventive rights to BlueRadios and knowledge of the terms of the

Golden-i Contract, Thibodeau and the Law Firm incorrectly named Kopin as the sole assignee of the '646 Application.

239.    Thibodeau and the Law Firm knew that they should have named BlueRadios as an assignee, but did not, in an effort to assist Kopin in attempting to obtain ownership of the '646 Application, the subject matter disclosed therein, and any resulting patents.

### The Law Firm omits BlueRadios inventors from the '462 Application. Instead, the Law Firm attempts to omit Claims based on BlueRadios technology (but then still relies on Figures representing BlueRadios' technology).

240.    When they originally filed the '462 Application, Kazanjian and the Law Firm did not file an oath or declaration of inventorship with the '462 Application.

241.    Tucker and Sample were co-inventors for the '462 application, and should have been named as inventors, and the Law Firm knew it.

242.    On January 12, 2009, the Law Firm filed declarations signed by Jacobsen, Parkinson, and Pombo, declaring themselves inventors on the '462 Application.

243.     The Law Firm did not file any declaration or oath signed by Tucker or Sample.

244.    Moreover, unbeknownst to BlueRadios, on March 6, 2009, Kazanjian filed an amendment to the '462 Application cancelling the '462 Application's claim of benefit to the '177 Provisional Application, and stated to the USPTO that, in view of that amendment, the '462 Application should only name Kopin employees,

46

Jacobsen, Parkinson, and Pombo as inventors.

245.   However, even after amendment, the '462 Application incorporated and built upon BlueRadios' inventive contributions, including i) BlueRadios' Hardware Figure and the subject matter to which it relates, ii) the Hardware Figure's description, which incorporates the '177 Provisional Application (naming only BlueRadios employees as inventors) by reference, and iii) aversion of BlueRadios' Bubble Figure and the subject to which it relates, and iv) Claim 4.

246.   BlueRadios' developments remained in the '462 Application after the amendment.

247.   Even after the amendment, BlueRadios employees should have been named as inventors in the '462 Application.

248.   By filing the request to amend the '462 Application, Kazanjian and the Law Firm rendered the list of inventors in the '462 Application incorrect.

249.    Upon information and belief, Kazanjian and the Law Firm knew that BlueRadios' employees should have remained as named inventors on the '462 Application and intentionally removed BlueRadios' employees as inventors.

250.   Kazanjian and the Law Firm agreed with Kopin to file documents with the USPTO deleting the '462 Application's claim of benefit to the '177 Provisional Application and removing BlueRadios employees, Tucker and Sample, as named inventors of the '462 Application.

251.    Kazanjian and the Law Firm filed such documents to further assist

47

Kopin in its attempts to obtain sole ownership of the patent to issue from the '462 Application, to the detriment of BlueRadios.

252.    Kopin, Kazanjian, and the Law Firm concealed from, and failed to disclose to, BlueRadios the fact that they filed documents to cancel the '462 Application's claim of benefit to the '177 Provisional Application and remove BlueRadios employees from the list of inventors in the '462 Application.

253.    The '462 Application issued on August 25, 2015 as U.S. Patent 9,116,340 (the "'340 Patent").

### The Law Firm tells the WIPO that BlueRadios' employees are inventors in the '147 PCT Application but does not name the BlueRadios' employees as inventors when prosecuting the identical claims in the '462 Application.

254.    On May 14, 2008, Thibodeau filed International Application No. PCT/US08/06147, titled "Mobile Wireless Display for Accessing Data from a Host and Method for Controlling" (the "'147 PCT").

255.    Thibodeau filed the '147 PCT with the WIPO on the same day that Kazanjian filed the '462 Application with the USPTO.

256.    The '147 PCT filed with the WIPO contains the same 44 claims as the '462 Application filed with the USPTO.

257.    In the PCT Request regarding the '147 PCT, Thibodeau named Kopin, Jacobsen, Parkinson, and Pombo of Kopin, and Tucker and Sample of BlueRadios as "applicant[s] and inventor[s]."

258.    In the PCT Request regarding the '147 PCT, Thibodeau stated that he,

and many others at the Law Firm, had been appointed to act on behalf of all of the applicants before the competent international authorities as their agent.

259.  Given their knowledge that BlueRadios' employees had assigned their inventive rights to BlueRadios, its knowledge of the terms of the Golden-i Contract, and the fact that the '147 PCT names BlueRadios employees as inventors, Thibodeau and the Law Firm knew that they incorrectly named Kopin as the sole applicant in the '147 PCT.

260.  Thibodeau and the Law Firm knew that they should have also named BlueRadios as an applicant in the '147 PCT, but did not, in an effort to assist Kopin in attempting to obtain sole ownership of the '147 PCT, the subject matter disclosed therein, and any resulting patents.

261.  On March 19, 2009, Thibodeau sent a letter to the WIPO regarding the '147 PCT and identified himself as the attorney for the '147 PCT applicants and inventors.

262.  In the March 19, 2009, letter, Thibodeau informed the WIPO that "Applicant/Inventor Wilfred I. Tucker['s]" name had been incorrectly identified as William Tucker in the May 14, 2008 PCT Request, that two "Applicant/Inventors, Mark Kramer and Randall Jones," had been inadvertently omitted from the" PCT Request and, as the attorney for the applicants and inventors, requested correction of those errors.

263.  However, in May 2011, the Law Firm abandoned the '147 PCT before a

49

patent issued in any country.

264.    Neither Kopin nor any of the Law Firm's attorneys ever informed BlueRadios that it was going to abandon, or had abandoned, the '147 PCT.

265.    Upon information and belief, the Law Firm and Kopin agreed to abandon the '147 PCT.

266.    Upon information and belief, the Law Firm abandoned the '147 PCT to aid and assist Kopin's efforts to obtain sole ownership of patent applications the Law Firm filed in the United States, including the '462 Application (which contained identical claims to the '147 PCT), and the resulting patents, to the detriment of BlueRadios.

267.    In the '147 PCT, the Law Firm and Kopin were attempting to add BlueRadios' employees as inventors.  However, in the '462 Application to the USPTO (which contained identical claims to the '147 PCT), the Law Firm was attempting to *remove* BlueRadios' employees as inventors.

268.    The Law Firm failed to disclose to BlueRadios and, upon information and belief, intentionally concealed from BlueRadios the fact that the Law Firm abandoned the '147 PCT.

**The Law Firm omits BlueRadios inventors from the '601 PCT application.**

269.    On March 27, 2009, Thibodeau filed International Application No. PCT/US2009/038601, titled "Handheld Wireless Display Device Having High-Resolution Display Suitable For Use As A Mobile Internet Device" (the "'601 PCT").

270.   The '601 PCT includes BlueRadios' Hardware Figure and the following as Claim 7:

> The device of Claim 1 wherein the wireless interface is a BlueTooth physical layer with a Bluetooth proxy to implement a packet switching gateway.

271.   The '601 PCT named only Kopin employees as inventors.

272.   The '601 PCT included the Hardware Figure and Claim 7.  As such, Thibodeau and the Law Firm knew that the '601 PCT should have named BlueRadios' employees as inventors. The '601 PCT's list of named inventors is incorrect.

273.   Thibodeau and the Law Firm also named Kopin as the sole applicant in the '601 PCT.

274.   As a result of their knowledge that BlueRadios' employees had assigned their inventive rights to BlueRadios, their knowledge of the terms of the Golden-i Contract, and the fact that the '601 PCT contained BlueRadios' developments (including those depicted by the Hardware Figure and Claim 7), Thibodeau and the Law Firm knew that they incorrectly named Kopin as the sole applicant in the '601 PCT.

275.   Thibodeau and the Law Firm knew that they should have named BlueRadios as an applicant, but they didn't do so to assist Kopin's attempt to obtain sole ownership of the '601 PCT, the subject matter disclosed therein, and any resulting patents.

276.    Neither Kopin nor any of the attorneys ever informed BlueRadios that the Law Firm was going to file, or had filed, the '601 PCT.

277.    Upon information and belief, Kopin, Thibodeau, and the Law Firm agreed to file the '601 PCT with only Kopin employees named as inventors, and without identifying BlueRadios as an applicant, despite knowledge of the Golden-i Contract and the fact that the '601 PCT contained subject matter conceived by BlueRadios employees who had assigned their inventive rights to BlueRadios and, thus, should have named BlueRadios employees as inventors.

278.    Upon information and belief, Thibodeau and the Law Firm filed the '601 PCT with only Kopin employees named as inventors and with Kopin identified as the sole applicant to aid and assist Kopin's efforts to obtain sole ownership of the '601 PCT, the subject matter it described, and any resulting patents, to the detriment of BlueRadios.

279.    Upon information and belief, Kopin, Thibodeau, and the Law Firm intentionally concealed from, and failed to disclose to, BlueRadios the fact that Thibodeau and the Law Firm filed the '601 PCT.

280.    By filing the '601 PCT with only Kopin employees named as inventors, Thibodeau and the Law Firm rendered the list of inventors in the '601 PCT incorrect.

281.    On February 6, 2018, United States Patent No. 9,886,231 (the "231 Patent") issued as the national phase entry of the '601 PCT in to the United States.

52

***The Law Firm advises Kopin about how strip BlueRadios' from ownership
of the '646 Application despite using BlueRadios IP in the application.***

282.   On June 29, 2012, Thibodeau and Matloff of the Law Firm sent Choi of

Kopin an e-mail, copied to many people associated with the Law Firm and Kopin,

but <u>not</u> to anyone associated with BlueRadios.  The e-mail contains the following

paragraph:

> On a side note, we have for some time been discussing with
> you strategies for handling any "BlueRadios" related claims.
> If Kopin now wishes to drop those claims in this case (which
> actually only amount to a few of the dependent claims that
> relate to the specific manner of using the Bluetooth wireless
> interface), one way to handle that claim amendment and the
> then necessary change to the list of inventors may be to file
> a continuation application. The continuation would cancel
> claims having the BlueRadios subject matter and list only
> Kopin inventors. Another approach would be to file an RCE
> with a Request to correct inventorship, but depending on
> the scope of the claims amended and/or cancelled, such a
> Request may require approval from BlueRadios.

(Highlighting added.)

283.   By this June 29, 2012 e-mail, the Law Firm and its attorneys were

explicitly advising and assisting Kopin on how to further use the patent prosecution

process to strip BlueRadios its interests in the intellectual property it had developed

before and during the Golden-i Project and deliver sole ownership to Kopin, despite

Kopin's fiduciary duties to BlueRadios and despite the Law Firm's fiduciary duties

to BlueRadios.

284.   Moreover, the Law Firm and its attorneys were attempting to strip

BlueRadios of its interests in its intellectual property secretly, so that BlueRadios

would not discover what it was doing.

285.    On August 6, 2012, Choi responded to the Law Firm's e-mail, stating that he "prefer[ed] filing a new continuation with revised claims that involve Kopin inventors only . . . .," the option the Law Firm identified as not requiring BlueRadios' approval.

286.    On September 6, 2012, Matloff filed documents with the USPTO amending '646 Application by cancelling the Bluetooth-related Claims 4, 5, 7, 15, 16, and 18.

287.    The same day, September 6, 2012, the Law Firm filed a Request for Correction/Amendment of Inventorship, requesting that the USPTO delete Tucker and Sample from the '646 Application's list of inventors, asserting such deletion was proper as "the result of the amendments to the claims.  The inventor's invention is no longer being claimed in the instant non-provisional application."

288.    However, even after amendment, the '462 Application incorporated and was built upon BlueRadios' inventive contributions, including: i) BlueRadios' Hardware Figure and the subject matter to which it relates, ii) a version of BlueRadios' Bubble Figure and the subject matter to which it relates, and iv) Claim 6.  Therefore, BlueRadios employees should have remained as inventors.

289.    The Law Firm knew that, despite Kopin's request to remove them, BlueRadios' employees should have remained named as inventors in the '646 Application.  Nevertheless, the Law Firm agreed with Kopin to file documents with

the USPTO that requested the removal of claims and BlueRadios employees from the list of named inventors in the '646 Application.

290.   Upon information and belief, the Law Firm deleted claims, and requested the USPTO to remove BlueRadios employees named as inventors from the '646 Application to aid and assist Kopin's efforts to obtain sole ownership of the '646 Application, the subject matter it contains, and any resulting patents, to the detriment of BlueRadios.

291.   By filing the Correction/Amendment of Inventorship to the '646 Application, Matloff and the Law Firm incorrectly named the inventors in the '646 Application.

292.   Neither Kopin nor the Law Firm ever informed BlueRadios that they were going to file, or had filed, documents with the USPTO that requested removal of claims or BlueRadios employees named as inventors from the '646 Application. Instead, the Law Firm and Kopin concealed from BlueRadios the fact that the Law Firm had filed such documents.

293.   The '646 Application issued on December 9, 2014 as U.S. Patent 8,909,296 (the "'296 Patent"). In contrast to the published '646 Application, the named inventors on the '296 Patent were just Parkinson and Jacobsen, as the BlueRadios inventors had been deleted by the Law Firm.

### The Law Firm files the '333 Application using BlueRadios' inventions but without naming BlueRadios' inventors.

294.   Cogswell and the Law Firm prepared and, on August 22, 2014, filed

U.S. Patent Application No. 14/466,333, titled "Wireless Hands-Free Computing Headset With Detachable Accessories Controllable By Motion, Body Gesture And/Or Vocal Commands" (the "'333 Application").

295.    The '333 Application includes BlueRadios' Hardware Figure, BlueRadios' Bubble Figure, and BlueRadios' developments associated with and depicted by those Figures.

296.    The '333 Application is a continuation in part of the '646 Application, which is a continuation in part of the '462 Application.

297.    The '333 Application names only Jacobsen, Pombo, and Parkinson of Kopin as Inventors.

298.    Cogswell and the Law Firm knew that, by filing the '333 Application without identifying BlueRadios employees as inventors, the '333 Application named the incorrect inventors.

299.    Furthermore, Cogswell and the Law Firm named Kopin as the sole applicant in the '333 Application.

300.    Because of their knowledge that BlueRadios' employees had assigned their inventive rights to BlueRadios, its knowledge of the terms of the Golden-i Contract, and the fact that the '333 Application contained subject matter conceived by BlueRadios inventors (including that depicted by the Hardware and Bubble Figures), Cogswell and the Law Firm knew that they should have named BlueRadios as an applicant but did not, in an effort to assist Kopin in attempting to

obtain sole ownership of the '333 Application, the subject matter disclosed therein, and any resulting patents.

301.    Neither Kopin nor the Law Firm ever informed BlueRadios that the Law Firm intended to file, or had filed, the '333 Application.

302.    Upon information and belief, Cogswell and the Law Firm and Kopin agreed to file the '333 Application naming only Kopin employees as inventors and without BlueRadios identified as an applicant.  Moreover, Cogswell and the Law Firm filed the '333 Application to assist Kopin in its attempt to obtain sole ownership of BlueRadios' proprietary information.

303.    Kopin, Cogswell, and the Law Firm concealed from, and failed to disclose to, BlueRadios the fact that Cogswell and the Law Firm had filed the '333 Application.

304.    On May 1, 2020, the USPTO sent the Law Firm a Notice of Abandonment of the '333 Application.  The Law Firm never advised BlueRadios of such abandonment.

### The Law Firm uses IP assigned to BlueRadios for the '662 Application but doesn't identify BlueRadios as an assignee in the application.

305.    The Law Firm knew, or should have known, that Parkinson had assigned to BlueRadios his rights in all intellectual property he developed during the time in which BlueRadios employed Parkinson.

306.    While Parkinson was employed by BlueRadios, on May 8, 2009, the Law Firm filed U.S. Provisional Patent No. 61/176,662, titled "Remote Control of

Host Application Using Tracking and Voice Commands" (the '662 Application").

307.    The '662 Provisional Application includes the Hardware Figure. However, the '662 Application does not name Kramer, Tucker, Sample, or Jones as an inventor.

308.    Because the Hardware Figure depicts subject matter conceived exclusively by BlueRadios employees, the Law Firm knew it should have, but did not, name BlueRadios employees as inventors in the '662 Provisional Application.

309.    Further, in applications claiming priority to the '662 Provisional Application, the Law Firm named only Kopin as the applicant and/or assignee.

310.    Given the Law Firm's knowledge that BlueRadios' employees had assigned their inventive rights to BlueRadios, their knowledge of the terms of the Golden-i Contract, and the fact that the '662 Provisional Application contained subject matter conceived by BlueRadios inventors (including that depicted by the Hardware Figure), the Law Firm knew that it should have, but did not, name BlueRadios as an applicant or assignee in patent applications claiming priority to the '662 Provisional Application.

311.    The '662 Provisional Application includes the following figure as Figure 1A:



(the "Remote Control Figure"), described therein as a high level diagram showing head mounted remote control/display device, host computer, virtual display and field of view.

312.    Parkinson conceived of the subject matter presented in the Remote Control Figure and related disclosure in the '662 Application while employed by BlueRadios and subject to the PIIA.

313.    As such, the Remote Control Figure represents BlueRadios' inventive contributions and intellectual property.

314.    The '662 Application includes the following figure as Figure 2:



(the "Voice and Head Tracking Command Figure"), described therein as a high level block diagram of the remote control device and host illustrating how voice and head tracking commands are translated to keyboard and mouse commands).

315.   Parkinson conceived of the subject matter presented in the Voice and Head Tracking Command Figure and related disclosure in the '662 Provisional Application while employed by BlueRadios.

316.   As such, the Voice and Head Tracking Command Figure represents BlueRadios' inventive contributions and intellectual property.

317.   After Parkinson resigned his employment with BlueRadios in June 2009, he went to work as a Kopin employee.

318.   In or around 2015, Parkinson left Kopin and founded WearNext, Inc. ("WearNext"), the company that became RealWear, a company that manufactures and sells head mounted wireless monocular display devices for industrial use.

319.   In 2015, Kopin began licensing intellectual property to WearNext.

320.    The intellectual property Kopin licensed to WearNext/RealWear includes technologies for use in the development and production of a Golden-i-like headset.

321.    After Parkinson began working as a Kopin employee, the Law Firm filed patent applications that contained the Remote Control Figure, or versions of it, and resulted in at least the following issued patents: United States Patent Nos. 8,929,954; 9,122,307; 9,134,793; 9,235,262; 9,351,141; 9,377,862; 9,383,816; 9,640,178; 9,640,181; 9,640,199; 9,817,232; 9,830,909; 9,904,360; 10,013,976; 10,070,211; 9,301,085; and 10,402,162 (collectively, the "Remote Control Figure Patents").

322.    After Parkinson began working as a Kopin employee, the Law Firm filed patent applications that contained the Voice and Head Tracking Command Figure, or versions of it, and resulted in at least the following issued patents: United States Patent Nos. 8,862,186; 10,627,860; 8,929,954; 9,122,307; 9,134,793; 9,235,262; 9,351,141; 9,383,816; 9,640,178; 9,640,181; 9,640,199; 9,817,232; 9,830,909; 9,904,360; 10,013,976; 10,070,211; 10,402,162 (the "Voice and Head Tracking Command Patents").

323.    Although the Law Firm knew, upon information and belief, that Parkinson had assigned to BlueRadios ownership of the intellectual property depicted by and related to the Remote Control Figure and the Voice and Head Tracking Command Figure, and that BlueRadios should be named as an applicant

or assignee of any patent applications or patents containing such intellectual property and Figures, the Law Firm failed to identify BlueRadios' ownership in any of the applications or patents that included the Remote Control Figure or the Voice and Head Tracking Command Figure.

324.   Instead, the Law Firm communicated to the USPTO that Kopin solely owned the Remote Control Figure Patents and the Voice and Head Tracking Command Patents. Such communications were untrue.

325.   Neither Kopin, the Law Firm, nor Parkinson ever informed BlueRadios that the Law Firm planned to file, or had filed, the '662 Application.

326.   Neither Kopin, the Law Firm, nor Parkinson ever informed BlueRadios that the Law Firm planned to apply for, or had applied for, the Remote Control Figure Patents or the Voice and Head Tracking Command Patents.

327.   Upon information and belief, based on the Law Firm's advice, Kopin asked the Law Firm, and the Law Firm agreed, to file the applications resulting in the Remote Control Figure Patents and the Voice and Head Tracking Command Patents with only Kopin listed as an owner and without referencing BlueRadios' ownership of those patents or BlueRadios' inventive contributions.

328.   Upon information and belief, the Law Firm filed the applications resulting in the Remote Control Figure Patents and the Voice and Head Tracking Command Patents with only Kopin listed as an owner and without referencing BlueRadios' ownership in or BlueRadios' inventive contributions to any of those

patents to aid and assist Kopin's efforts to obtain sole ownership of the Remote Control Figure Patents or the Voice and Head Tracking Command Patents, to the detriment of BlueRadios.

329.   The Law Firm, Kopin, and Parkinson failed to disclose to and, upon information and belief, concealed from BlueRadios the fact that the Law Firm had filed the '662 Application.

330.   Upon information and belief, the Law Firm, Kopin, and Parkinson concealed from, and failed to disclose to, BlueRadios the fact that the Law Firm filed numerous patent applications containing intellectual property that had been assigned to BlueRadios, including that depicted by and related to the Remote Control Figure and the Voice and Head Tracking Command Figure.

### BlueRadios files a lawsuit against Kopin, et al., in Colorado.

331.   Upon information and belief, Kopin has also monetized (via licenses, royalty agreements, equity, research and development agreements and agreements to purchase microdisplays from Kopin) BlueRadios' technology and developments and processes to third parties (including RealWear, Motorola, Verizon, Fujitsu Limited, and the United States Government), that BlueRadios developed prior to its collaboration with Kopin and as part of the Golden-i Project.

332.   On August 12, 2016, BlueRadios filed a lawsuit against Kopin in the United States District Court for the District of Colorado, Case No. 16-cv-02052-JLK (the "Kopin Lawsuit").

333.   Among other things, BlueRadios seeks correction of inventorship of certain patents that the Law Firm filed.

334.   The Law Firm's acts and omissions directly and proximately caused BlueRadios to have to seek correction of inventorship, and to seek proper ownership of intellectual property in the Kopin Lawsuit.

### The Law Firm uses BlueRadios' developments to prosecute the '860 Patent for a Military Golden-i, but doesn't identify BlueRadios' employees as inventors or BlueRadios as an owner or assignee.

335.   On May 10, 2012, the Law Firm filed an application for what became US Pat. No. 10,627,860, "Headset computer that uses motion and voice commands to control information display and remote devices (the "'860 Patent').

336.   The '860 Patent names Parkinson as one of its inventors and is solely owned by Kopin.

337.   The '860 Patent issued April 21, 2020 and includes illustrations directed to a military use of the Golden-i Project, depicted in Fig. 5A and 5B:



338.   The '860 Patent also includes Fig. 10, which is a version of Fig. 2 of the

'662 provisional application (the "Voice and Head Tracking Commands Figure")

filed when Parkinson was an employee of BlueRadios.



339.   For almost eight years, while prosecuting the application that issued

as the '860 Patent, the Law Firm knew that the Voice and Head Tracking

Commands Figure was included therein, and thus, that BlueRadios had ownership rights in the patent application and any issued patent.

340.   For the past four years, during the pendency of the Kopin Lawsuit, the Law Firm was fully aware that BlueRadios had requested documents from Kopin related to the Military Golden-i.

341.   For the past four years, the Law Firm has been aware that Kopin was telling BlueRadios that there was no Military Golden-i.

342.   For the past four years, the Law Firm failed to communicate to BlueRadios that that '860 Patent included BlueRadios' inventive contributions and that the Law Firm was favoring Kopin over BlueRadios in the prosecution of the patent and, thereby, caused harm to BlueRadios.

### *The Law Firm agrees to a Joint Motion to Correct Inventorship of the '340 Patent and the '231 Patent.*

343.   On November 28, 2018, the district court in the Kopin Lawsuit granted BlueRadios' and Kopin's joint motion to correct the inventorship of the '340 Patent and the '231 Patent.

344.   The Law Firm's acts and omissions directly and proximately caused the need to correct the inventorship of the '340 Patent and the '231 Patent.

### *The Law Firm files Terminal Disclaimers rendering the '613 Patent and the '296 Patent unenforceable, thus depriving BlueRadios the benefits of owning the patents.*

345.   An inventor cannot obtain a second patent on the same invention.

66

346.   Should an inventor apply for a second patent on the same invention, such application may result in a "double patenting rejection" where conflicting claims to the inventions are not identical, but are not patentability distinct from the subject matter claimed in a commonly owned patent, because the issuance of a second patent would provide an unjustified extension of the 20-year term of a patent.

347.   A "double patenting rejection" can be avoided or overcome by filing a "terminal disclaimer."

348.   A terminal disclaimer requires that the two applications be "commonly owned" and must include a provision that any patent granted on the more recent application be enforceable only for and during the period that the patent is commonly owned with the older application or patent.

349.   The '296 Patent, as currently issued, names only Jacobsen and Parkinson as inventors and identifies Kopin as the sole assignee.

350.   On April 29, 2013, the Law Firm filed a terminal disclaimer asserting that Kopin solely owned the '340 Patent and that the '296 Patent was commonly owned with the '340 Patent.  The '296 Patent includes BlueRadios' Bubble and Hardware Figures.

351.   The '613 Patent names Parkinson, Jacobsen, and Pombo as inventors and identifies Kopin as the sole assignee.  The '613 Patent includes BlueRadios' Bubble and Hardware Figures.

67

352.    On December 10, 2015, the Law Firm filed a terminal disclaimer asserting that Kopin solely owned the '340 Patent and that the '613 Patent was commonly owned with the '340 Patent.

353.    The USPTO issued the '296 Patent and the '613 Patent only after the Law Firm filed the terminal disclaimers.

354.    The USPTO required the terminal disclaimers before issuing the '296 Patent and the '613 Patent to overcome a double patenting rejection arising from the preexisting '340 Patent.

355.    The USPTO issued the '296 Patent and the '613 Patent with the understanding that such patents would have the same ownership as the '340 Patent.

356.    After the district court in the Kopin Lawsuit entered the order on BlueRadios' and Kopin's joint motion to correct inventorship, BlueRadios co-owned the '340 Patent.

357.    However, because of the Terminal Disclaimers filed by the Law Firm, the '296 Patent and the '613 Patent are now unenforceable and the Law Firm has deprived BlueRadios of the ownership rights of those patents.

358.    The Law Firm refused, and continues to refuse, to correct the '296 Patent and the '613 Patent to reflect BlueRadios' ownership of those patents, thereby denying BlueRadios of the benefit of owning enforceable patents.

359.    By refusing to correct the '296 Patent and the '613 Patent, the Law

Firm has favored its client Kopin over its client BlueRadios.

### *The Law Firm abandons the '548 Application in an attempt to scrape off BlueRadios from the '646 Application.*

360.    On December 21, 2017, the Law Firm filed U.S. Patent Application No. 15/850,548, titled "Head Worn Wireless Computer Having High-Resolution Display Suitable For Use As A Mobile Internet Device" (the "'548 Application").

361.    On August 23, 2018, the Law Firm amended the '548 Application, to include claims that are identical to Claim 4 in the '646 Application.

362.    The '548 Application is also a continuation of the '231 Patent (which has been corrected to include both BlueRadios and Kopin inventors).

363.    The Law Firm knew that the '548 Application should have named, but did not name, BlueRadios' employees as inventors.

364.    The presence of admitted BlueRadios claimed inventions in the '548 Application provided BlueRadios with ownership rights in the '548 Application.

365.    By permitting the '548 Application to go abandoned, the Law Firm harmed BlueRadios and deprived BlueRadios of the ability to preserve its ownership rights in the '548 Application and to file continuation applications from the '548 Application.

366.    On August 12, 2019, the USPTO issued a Notice of Abandonment of the '548 Application.

367.    The Law Firm abandoned the '548 Application without notice to BlueRadios, to BlueRadios' detriment.

368.   Upon information and belief, the Law Firm abandoned the '548 Application because it included identical dependent claims that the Law Firm deleted from the '646 Application in an effort to wrongfully remove BlueRadios employees named as inventors, as explained above.

### *The Law Firm used and continues to use BlueRadios' intellectual property, developments and inventive contributions without attributing inventorship or ownership to BlueRadios.*

369.   The Law Firm repeatedly and systematically incorporated BlueRadios' developments in patent applications the Law Firm filed without naming BlueRadios employees as inventors or otherwise identifying BlueRadios' ownership of the intellectual property contained in those applications.

370.   As of the date of this filing, BlueRadios' developments appear in more than twenty patent applications or patents that do not include BlueRadios employees as inventors or otherwise identify BlueRadios as an owner.  Rather, those patent applications and patents incorrectly identify Kopin as the sole owner.

371.   Neither Kopin nor the Law Firm informed BlueRadios that they intended to file, or had filed, patent applications that included BlueRadios' developments, but nevertheless excluded BlueRadios inventors and otherwise failed to identify BlueRadios' ownership.

372.   Upon information and belief, based on the Law Firm's advice, Kopin asked the Law Firm, and it agreed, to file patent applications that include BlueRadios' inventions in applications, but not name BlueRadios' employees as

inventors or identify BlueRadios' ownership of the intellectual property in claims identified in the patents.

373.   Upon information and belief, the Law Firm filed the patent applications that include BlueRadios' developments, but exclude BlueRadios inventors and otherwise failed to identify BlueRadios' ownership, to aid and assist Kopin in its attempts to obtain sole ownership of those patent applications and the resulting patents, to the detriment of BlueRadios.

374.   Upon information and belief, Kopin and the Law Firm intentionally concealed and failed to disclose the fact that they filed patent applications that include BlueRadios developments, but exclude BlueRadios inventors and otherwise fail to identify BlueRadios' ownership.

375.   Upon information and belief, Kopin has licensed and is otherwise monetizing many of the patents that incorporate BlueRadios' inventions, which should be owned by BlueRadios, to RealWear and other third-parties, including Motorola, Verizon, Fujitsu Limited, and the United States Government.

***David E. Brook does not disclose his conflicts of interest or communicate Kopin's intentions despite being on Kopin's board and a principal of the Law Firm.***

376.   As a principal and founder of the Law Firm, as a member of Kopin's Board of Directors and, indeed, as the Secretary of the Board, Brook was and is in a unique position to understand Kopin's plans to obtain patents that included BlueRadios' intellectual property and Kopin's attempts to obtain sole ownership of

issued patents that include BlueRadios intellectual property.

377.    As an employee and principal of the Law Firm, Brook is imputed with the knowledge of the other attorneys at the Law Firm.

378.    As an employee and principal of the Law Firm, Brook also had duties of loyalty to his other client, BlueRadios.

379.    As an employee and principal of the Law Firm, Brook also had duties to fully communicate important information to his other client, BlueRadios.

380.    Despite his unique position with Kopin, and his role as a founder and employee of the Law Firm, Brook did not communicate to BlueRadios his conflicts of interest or his Law Firm's actions on behalf of Kopin with respect to BlueRadios' intellectual property.

## FIRST CLAIM FOR RELIEF: LEGAL MALPRACTICE
### (Against All Defendants)

381.    Plaintiff incorporates Paragraphs 1 through 380 as if fully set forth herein.

382.    Beginning in 2007 through, at least 2016, the Defendants had an actual or implied attorney-client relationship with BlueRadios.

383.    The scope of the Defendants' attorney-client relationship included performing the Patent Work for BlueRadios' intellectual property created before its collaboration with Kopin and its intellectual property created in collaboration with Kopin.

384.    BlueRadios had numerous conversations with the Law Firm's

attorneys and communicated substantial and highly technical confidential information about BlueRadios' inventions with sufficient detail so that the attorneys could prepare and file patent applications for BlueRadios' to protect its inventions.

385.    The Law Firm and its attorneys gave legal advice to BlueRadios.

386.    BlueRadios relied upon the legal advice that it received from the Law Firm and its attorneys and expected that the Law Firm would be acting to protect its interest with respect to the Patent Work.

### Breach of Fiduciary Duty Allegations

387.    As BlueRadios' attorneys, the Defendants owed BlueRadios a fiduciary duty of loyalty to protect BlueRadios' legal and financial interests and BlueRadios' intellectual property.

388.    The Defendants breached their fiduciary duty to BlueRadios in at least the following ways:

a.   The Law Firm and its attorneys, including Brook, had conflicts of interest, and failed to disclose or obtain informed consent for the conflicts of interest;

b.   The Law Firm developed and executed a plan to assist Kopin to acquire BlueRadios' intellectual property, including intellectual property that BlueRadios developed before its collaboration with Kopin, and obtain patent protection for that intellectual property,

which patents would be owned by Kopin, and not BlueRadios;

c.  The Law Firm failed to communicate to BlueRadios its intentions, or its other client Kopin's intentions, with respect to obtaining patent protection for BlueRadios intellectual property;

d.  In their many communications with BlueRadios' employees, at no time did the Law Firm disclose to BlueRadios that they intended to use BlueRadios' confidential information for Kopin's benefit and to BlueRadios' detriment;

e.  In their many communications with BlueRadios' employees, at no time did the Law Firm or its attorneys disclose to BlueRadios that they were not acting as BlueRadios' attorneys;

f.  In their many communications with BlueRadios' employees, at no time did the Law Firm disclose to BlueRadios that they BlueRadios should seek separate counsel;

g.  The Law Firm filed patent applications that omitted BlueRadios' employees as named inventors or co-inventors of the claimed inventions when BlueRadios' employees were, in fact the, inventors or co-inventors of the claimed inventions;

h.  After filing patent applications that properly named BlueRadios' employees as named inventers or co-inventors of the claimed inventions, the Law Firm later filed documents that omitted the

BlueRadios' employees as the named inventors and included Kopin's employees as the named inventors when, sometimes, the Kopin employees were not inventors, and otherwise cause the patents to reflect incorrect inventorship;

i.  The Law Firm filed patent applications that did not correctly reflect that certain of the inventors had assigned their rights, title and interest in the patent applications or patents to BlueRadios;

j.  The Law Firm filed documents with the USPTO requesting that claimed inventions by BlueRadios be deleted from the patent applications without informing BlueRadios that the Defendants intended to delete such claimed inventions or advising BlueRadios of the effect that such deletions would have on BlueRadios' rights to i) own the patents, ii) protect its intellectual property, or iii) monetize its inventions;

k.  The Law Firm deliberately abandoned patent applications covering claimed inventions by BlueRadios' employees without informing BlueRadios that they were abandoning such claimed inventions, and without advising BlueRadios about how such abandonment would affect BlueRadios' rights to i) own the patents, ii) protect its intellectual property or iii) monetize its inventions;

l.  The Law Firm failed to identify BlueRadios as owners of the patents

that were issued for which BlueRadios should have been identified as owners;

m. The Law Firm concealed from BlueRadios the fact that the Law Firm intended to file, and had filed, documents deleting the claimed inventions by BlueRadios employees, removing BlueRadios employees as named inventors, and abandoning international patent applications;

n. Upon information and belief, as the Secretary and Member of the Kopin Board of Directors, and as an employee of the Law Firm, Brook was in a position to have a unique position to have an understanding of Kopin's plans.  Brook also had a duty of loyalty and a duty of care to BlueRadios.  Brook should have disclosed what he knew about Kopin's plans to BlueRadios and advised BlueRadios in 2008 that it needed separate counsel to protect its interests in the patent application.

o. The Law Firm knew, or should have known, that BlueRadios was relying on its legal advice, was disclosing confidential intellectual property information to the Law Firm and Kopin in the belief that the Law Firm would protect BlueRadios' interests in the intellectual property and seek patents on such intellectual property as appropriate, and yet the Law Firm did protect BlueRadios' interest. Indeed, the Law Firm was actively working against BlueRadios' interest in favor of Kopin.

389.   The Defendants' breaches of fiduciary duty proximately caused harm to BlueRadios.

390.   As a result of the Defendants' breaches of fiduciary duty, BlueRadios has suffered, and continues to suffer, injuries, damages, harms, and losses in an amount to be proven at trial.

**Professional Negligence Allegations**

391.   To the extent that the acts or omissions set forth in Paragraph 386, above, and the other allegations in this Complaint, do not constitute a breach of fiduciary duty, such acts and omissions constitute professional negligence.

392.   The Defendants failed to exercise reasonable care and skill in handling the matters for which they were retained.

393.   The Defendants' professional negligence proximately caused harm to Plaintiff.

394.   As a result of the Defendants' professional negligence, Plaintiff BlueRadios incurred, and continues to suffer, injuries, damages, harms, and losses in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF: BREACH OF FIDUCIARY DUTY BASED ON A CONFIDENTIAL RELATIONSHIP**
**(Against All Defendants)**

395.   Plaintiff incorporates Paragraphs 1 through 380 as if fully set forth herein.

396.   BlueRadios had a relationship of trust and confidence with, and

reliance upon, the Defendants for the purpose of obtaining patent protection for its intellectual property.

397.   Defendants had a high degree of control over BlueRadios' intellectual property, as BlueRadios entrusted the Defendants with that intellectual property for purposes of obtaining patent protection.

398.   The Defendants encouraged BlueRadios to disclose its confidential intellectual property and trade secrets to the Defendants for the purpose of seeking patent protection.

399.   The Defendants had a fiduciary duty to BlueRadios arising out of their confidential relationship with BlueRadios.

400.   The Defendants breached their fiduciary duty to BlueRadios.

401.   The Defendants' breaches of fiduciary duty proximately caused harm to Blue Radios.

402.   As a result of the Defendants' breaches of fiduciary duty based on the confidential relationship, BlueRadios has suffered, and continues to suffer, injuries, damages, harms, and losses in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF:
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

403.   Plaintiff incorporates Paragraphs 1 through 380 as if fully set forth herein.

404.   As a result of the joint venture between BlueRadios and Kopin, Kopin

owed BlueRadios fiduciary duties.

405.   Because, through their course of dealing as joint venturers, BlueRadios disclosed and Kopin obtained BlueRadios' confidential and proprietary information, Kopin also had a confidential relationship of trust that created fiduciary duties owed to BlueRadios.

406.   Kopin breached the fiduciary duties it owed to BlueRadios in at least the following ways:

a.   Kopin treated BlueRadios' confidential and proprietary information as its own and intentionally and wrongfully represented that its employees invented the inventions claimed in the patent applications when it was BlueRadios' employees who were the actual inventors;

b.   Kopin directed the Defendants to file provisional patent applications that included technology that BlueRadios had invented before collaborating with Kopin, and intellectual property that BlueRadios shared with Kopin in confidence, without informing BlueRadios of that it was filing patent applications for BlueRadios' intellectual property;

c.   On technology that BlueRadios and Kopin invented together, Kopin directed the Defendants to wrongfully remove BlueRadios employees named as co-inventors of the claimed inventions in patent applications, and leave only Kopin's employees as the named inventors;

d.   Kopin directed the Defendants to file documents deleting claims for

technology invented by BlueRadios employees and claims of benefit to

provisional patents filed solely on behalf of inventors employed by

BlueRadios;

e.   Kopin concealed from BlueRadios the fact that Kopin treated

BlueRadios' confidential and proprietary information as its own;

f.   Kopin attempted to squeeze out BlueRadios from the benefits of the

Golden-i Project by using BlueRadios' inventive contributions,

monetizing BlueRadios' developments and intellectual property.  By

way of example, Kopin used BlueRadios' inventions to develop and

market the Solos™ product and similar products while concealing such

action from BlueRadios.

407.   The Defendants knew, or should have known, that Kopin was

breaching its fiduciary duties to BlueRadios.

408.   The Defendants actively participated with, and substantially assisted

Kopin in breaching the fiduciary duties owed to BlueRadios.

409.   The Defendants' aiding and abetting Kopin in breaching the fiduciary

duties has proximately caused BlueRadios injuries, damages, harms, and losses in

an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF:
## FRAUDULENT NONDISCLOSURE OR FRAUDULENT CONCEALMENT
### (Against All Defendants)

410.   Plaintiff incorporates Paragraphs 1 through 380 and 382 through 388

as if fully set forth herein.

411.   The Defendants owed BlueRadios a duty to disclose to BlueRadios certain past or present facts, including the filing of, status of, and changes to, the patent applications the Defendants prepared and filed on behalf of BlueRadios and its employees.

412.   As described with specificity throughout this Complaint, the Defendants concealed material facts and failed to disclose material facts they had a duty to disclose, including facts relating to the filing of, status of, and changes to, the patent applications the Defendants prepared and filed, including those on behalf of BlueRadios and its employees.  These facts, as more specifically described above, include:

a.   That the Defendants had replaced BlueRadios employees with Kopin employees as the named inventors of the claimed inventions in patent applications;

b.   That the Defendants had filed documents with the USPTO requesting deletion of claimed inventions conceived by BlueRadios;

c.   That the Defendants had filed documents with the USPTO requesting that BlueRadios employees be removed as named inventors of the claimed inventions in patent applications in which the BlueRadios employees were previously named as inventors;

d.   That the Defendants abandoned patent applications concerning

inventions and claims conceived by BlueRadios employees;

e.  The consequences of abandoning patent applications on BlueRadios' ability to obtain patent protection for its inventions or BlueRadios' ability to protect and monetize its intellectual property;

f.  That the Defendants had advised Kopin on how to attempt to delete BlueRadios claimed inventions and inventors from patent applications previously filed;

g.  That the Defendants had filed patent applications with the USPTO that contained incorrect representations statements regarding inventorship;

h.  That the Defendants had filed patent applications that relied on inventions conceived by BlueRadios employees but did not identify those BlueRadios employees as inventors; and

i.  That the Defendants had filed patent applications that disclosed inventions conceived by BlueRadios employees but did not identify BlueRadios as an owner of such applications.

413.  The Defendants failed to disclose these facts and concealed them from BlueRadios with the intent to create a false impression of the actual facts.

414.  The Defendants failed to disclose and concealed such facts from BlueRadios with the intent that i) BlueRadios continue to design and develop technology to further the Golden-i Project, and ii) BlueRadios continue to disclose

the specifications of its technology and inventions to the Defendants in sufficient detail so that the Defendants could prepare additional patent applications, so that the Defendants could continue to orchestrate the patent application and prosecution process in such a way that Kopin could monetize the Golden-i technology and BlueRadios could not.

415.   In reasonable and justified reliance on the assumption that the above concealed and undisclosed facts did not exist, BlueRadios continued to design and develop technology to further the Golden-i Project and continued to disclose the specifications of its technology and inventions to the Defendants in sufficient detail so that the Defendants could prepare additional patent applications.

416.   The Defendants' nondisclosure and concealment of the facts described above and BlueRadios' justified reliance on their nonexistence caused BlueRadios injuries, damages, harms, and losses in an amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF:**
**AIDING AND ABETTING FRAUDULENT CONCEALMENT**
**(Against All Defendants)**

417.   Plaintiff incorporates Paragraphs 1 through 380 and 382 through 388 as if fully set forth herein.

418.   As a result of their confidential, contractual and joint venture relationship, Kopin owed BlueRadios a duty to disclose to BlueRadios certain past or present facts, including facts regarding the filing of, status of, and changes to, the patent applications relating to BlueRadios' intellectual property.

419.   As described with specificity throughout this Complaint, Kopin concealed from BlueRadios material facts relating to the filing of, status of, and changes to patent applications, including facts regarding Kopin's and/or the Defendants' actions in connection with:

   a.  Filing provisional patent applications that included BlueRadios' trade secrets and proprietary information;

   b.  Erroneously replacing BlueRadios employees with Kopin employees as the named inventors in patent applications;

   c.  Filing documents with the USPTO requesting deletion of claimed inventions conceived by BlueRadios' employees;

   d.  Filing documents with the USPTO requesting removal of BlueRadios employees as inventors on patent applications in which they were previously named as inventors;

   e.  Abandoning international patent applications that included claimed inventions conceived by BlueRadios employees and/or that included BlueRadios developments;

   f.  Advising Kopin on how to attempt to delete BlueRadios claimed inventions and inventors from patent applications that Defendants had previously filed;

   g.  Directing Defendants to file provisional applications that included BlueRadios' confidential and proprietary information, without

informing BlueRadios of the same, and filing documents replacing BlueRadios employees with Kopin employees in naming inventors, deleting claimed inventions conceived by BlueRadios employees, deleting claims to the benefit to provisional patent applications, such applications naming BlueRadios employees, and deleting BlueRadios employees as named inventors in patent applications; and

h. Marketing and selling Solos™ and similar products that incorporate information and technology BlueRadios designed and developed in furtherance of the Golden-i Project.

420.   Kopin concealed such facts from BlueRadios with the intent that i) BlueRadios continue to design and develop technology to further the Golden-i Project and provide such technology to Kopin and the Defendants.

421.   In reasonable and justified reliance on the assumption that the above concealed facts did not exist, BlueRadios continued to design and develop technology to further the Golden-i Project and continued to provide such technology to Kopin and the Defendants.

422.   The Defendants knowingly participated in, and gave substantial assistance to, Kopin in concealing from BlueRadios the facts described above.

423.   The Defendants aided and abetted Kopin in concealing from BlueRadios the facts described above.

424.   The Defendants' aiding and abetting Kopin in concealing the facts

described above from BlueRadios caused BlueRadios injuries, damages, harms, and losses in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF: CIVIL CONSPIRACY
### (All Defendants)

425.    Plaintiff incorporates Paragraphs 1 through 380 and 382 through 388 as if fully set forth herein.

426.    The Defendants and Kopin agreed, by words or conduct, to accomplish an unlawful goal or accomplish a goal through unlawful means.

427.    One or more unlawful acts were performed to accomplish the goal or one or more acts were performed to accomplish the unlawful goal.

428.    The Defendants knew that Kopin's conduct constituted a breach of its fiduciary duties and the Defendants substantially assisted in or encouraged that conduct.

429.    The Defendants' conspiracy with Kopin caused BlueRadios had injuries, damages, harms, and losses in an amount to be proven at trial.

430.    Plaintiff requests a jury trial for all issues so triable.

## PRAYER FOR RELIEF AND JURY DEMAND

Wherefore, BlueRadios prays for judgment on its claims against the Defendants as follows:

a.    Damages in an amount to be determined at trial;

b.    Pre- and post-judgment interest;

c.    Moratory interest according to proof;

c.      Attorneys' fees and costs as permitted by law;

d.      Any other relief the Court deems just and proper.

**Plaintiff BlueRadios, Inc. demands a trial by jury on all issues so triable.**


YURKO PARTNERS, P.C.


/s/ Douglas W. Salvesen
Douglas W. Salvesen
(BBO# 550322)
One Tech Drive, Suite 205
Andover, MA 01810
Phone Number:  (617) 381-4404
Dsalvesen@yurkopartners.com


OGBORN MIHM LLP
*Pro Hac Vice admission pending*

/s/ Michael T. Mihm
Michael T. Mihm
Elizabeth J. Hyatt
James E. Fogg
1700 Lincoln, Suite 2700
Denver, Colorado  80203
Phone Number:  (303) 592-5900
Fax Number:     (303) 592-5910
Michael.Mihm@OMTrial.com
Elizabeth.Hyatt@OMTrial.com
James.Fogg@OMTrial.com

*Attorneys for Plaintiff BlueRadios, Inc.*